UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

------------------------------------------------------------------------X
JEFFREY CONROY,

                               Petitioner,

      v.-

**MEMORANDUM AND ORDER**
14-cv-5832 (JMA)

STEVEN RACETTE, SUPERINTENDENT OF CLINTON CORRECTIONAL FACILITY,

                             Respondent.
------------------------------------------------------------------------X

FILED
CLERK

7/6/2017 4:59 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**APPEARANCES:**

Jeffrey Conroy
Clinton Correctional Facility - P.O. Box 2001
Dannemora, NY 12929
      *Pro se petitioner*

Glenn D. Green
Suffolk County District Attorney's Office
200 Center Drive
Riverhead, NY 11901
      *Attorney for respondent*

**AZRACK, United States District Judge:**

On April 19, 2010, Jeffrey Conroy was convicted in Suffolk County Supreme Court of manslaughter in the first degree as a hate crime, gang assault in the first degree, conspiracy in the fourth degree, and three counts of attempted assault in the second degree as a hate crime.[1] On May 26, 2010, Conroy was sentenced to a determinate period of imprisonment of twenty-five years with two and one-half years of post-release supervision on the manslaughter count and to lesser sentences on the other charges, with all sentences to run concurrently.

---

[1] In determining the precise crimes for which Conroy was convicted, the Court relies on the portion of the trial transcript in which the jury read its verdict. (See Trial Transcript 3969–3971.) To the extent that Conroy's account of his convictions in his petition conflicts with the trial court record, the Court disregards Conroy's account as erroneous. (See, e.g., Pet. 1.)

1

Before the Court is Conroy's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (See Petition for Writ of Habeas Corpus ("Pet."), ECF No. 1.) The petition advances a number of arguments, all of which were exhausted and adjudicated on the merits on direct appeal in state court. For the reasons below, the Court finds that the state court's decisions were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts. The Court thus denies the instant petition in its entirety.

## I. BACKGROUND

### A. Factual Background

Petitioner was charged under two separate indictments along with six co-defendants: Jordan Dasch, Anthony Hartford, Nicholas Hausch, Christopher Overton, Jose Pacheco, and Kevin Shea. Each of petitioner's co-defendants pleaded guilty, and Hausch testified against petitioner at trial.

The indictments charging petitioner concerned two distinct incidents, and the Court sets out the facts underlying each of those indictments separately.

#### 1. November 3, 2008

The first incident occurred on November 3, 2008, when Octavio Cordovo and Adrian Costillo were attacked near a gas station in Medford, New York. (See Trial Transcript ("Tr.") 2537–2545, ECF Nos. 10-7–10-13.) As Cordovo and Costillo were walking towards the gas station, they passed two young men—a white man wearing a white t-shirt, and a black man wearing a gray sweatshirt. (Id. at 2541.) The two young men asked Cordovo and Costillo if they had cigarettes, and Costillo told them that they did not. (Id. at 2543.) The two young men then attacked Cordovo and Costillo, and the "white guy" ultimately rendered Cordovo unconscious. (Id. at 2544.)

Shortly thereafter, Vincent Martino, a bystander, found Cordovo laying in the street near the gas station. (Id. at 2562.) Martino observed a "white male and a black Hispanic male" standing over Cordovo. (Id. at 2512–15, 2563.) Martino approached and called out to the two young men, at which time they ran away. (Id. at 2563–64.) Martino pursued the two young men and eventually caught up to them at the same time that a police patrol car arrived. (Id. at 2564–67.) Martino grabbed the young men and pushed them against the car. (Id. at 2567, 2574.) The police detained the two young men and identified them as petitioner and Jose Pacheco, a co-defendant. (Id. at 2515–21.) While the officers were questioning petitioner, Pacheco, Cordovo, and Martino, four young women approached and began "screaming" at the officers, saying that petitioner and Pacheco "didn't do it." (Id. at 2516.) When it became clear that Cordovo was refusing either to cooperate or to press changes, the police released both petitioner and Pacheco. (Id. at 2521–22.)

### 2. November 8, 2008

The second incident occurred on November 8, 2008. On that evening, petitioner met a large group of acquaintances at the Medford train station. (Id. at 3223.) Jason Moran, an un-charged member of the group, testified that the group discussed the fact that "someone jumped a Mexican earlier that day." [2] (Id. at 1638.) The group later travelled to Southaven Park in Medford, where Moran testified that petitioner and other members of the group planned to "beat a Mexican" in Patchogue later that evening. (Id. at 1645–48.)

There is some evidence that petitioner did not want to go to Patchogue with the group because he did not want to get into trouble, and that he instead wanted either to go to a party or to go home. (Id. at 2471–74.) Petitioner did not, however, go home; instead, the group drove to

---

[2] This comment referred to an earlier incident involving certain co-defendants. Petitioner was not involved in that earlier incident and was not charged with any crimes arising from it.

Patchogue where they encountered Hector Sierra walking on the side of the road. (Id. at 2983–84, 2303–04.) Some of the members of the group—apparently including petitioner—exited the vehicle to chase Sierra, but Sierra escaped without sustaining any serious physical injuries. (Id. at 2304–05, 2883). The group then returned to the vehicle and drove away. (Id. at 2306–07.)

After the group parked their vehicle, they walked onto Railroad Avenue and encountered Angel Loja and Marcelo Lucero, two Hispanic men. (Id. at 2308–09.) The group began shouting racial epithets at Loja and Lucero, although there is some ambiguity concerning precisely which epithets were shouted. Co-defendant Nicholas Hausch testified that the group was "calling them names like 'beaners,' [and] 'Mexicans.'" (Id. at 2310–11.) At trial, Loja testified that the group called him and Lucero "fuckin' niggers," "fuckin' Mexicans," "fuckin' illegals," and "[f]ucking Spics." (Id. at 2010.) In his prior written statement, however, Loja had stated that the group had called him and Lucero "niggers and fuckin' niggers," with no mention of the other epithets. (See id. at 2044.) In any event, the evidence at trial indicated that the group used at least some racial epithets and that a fight ensued.

Hausch testified that Kevin Shea, another co-defendant, punched one of the men in the mouth and then began backing away. (Id. at 2311–12.) However, Loja testified that the group knocked Lucero to the ground and hit, punched, and kicked him. (Id. at 2013–14.) According to Loja, Lucero stood up, removed his jacket and belt, and then began waving the belt "around him," which caused the group to step back. (Id. at 2014–15.)

Petitioner's own statements concerning the event are inconsistent. In a written statement made after he was arrested, petitioner said that, after Lucero began swinging the belt, petitioner ran "toward[s] him and stabbed him once in either his shoulder or chest." (Id. at 2837.) Thereafter, he turned to Hausch and said, "Oh shit. I'm fucked. I stabbed him." (Id.) At trial,

however, petitioner testified that this written statement contained false information, and that co-defendant Christopher Overton—rather than petitioner—had stabbed Lucero. (Id. at 3251.) According to petitioner's testimony, Overton told him to take the blame because Overton did not want this incident to be used against him at his sentencing on a separate murder case from the previous year. (Id. at 3251–52.) Petitioner also testified that Overton assured him that he only had "nicked" Lucero in the shoulder and that Lucero was not seriously injured. (Id.)

Hausch testified that he saw petitioner holding a bloody knife after the group left the scene of the altercation. (Id. at 2318.) Hausch further testified that the group told petitioner to throw the knife away, but petitioner did not do so and instead told the group that he had washed it off in a puddle. (Id.)

At approximately midnight, a police officer arrived on the scene where Lucero had been stabbed and found Lucero lying on the ground in a pool of blood. (Id. at 1694–98.) Lucero's breathing was rapid and labored, and he was unable to communicate. (Id. at 1698–99.) The officer called for an ambulance and applied pressure to the hole in the side of Lucero's chest until emergency responders arrived. (Id. at 1513, 1697, 1700.) Despite their efforts, Lucero died at the hospital. (Id. at 2795.)

Shortly after the incident, the group was stopped by another police officer. (Id. at 1769–72.) The officer had received a broadcast description of possible suspects of the stabbing and so conducted a line-up of the members of the group, directing several police officers to pat them down. (Id. at 1773–74.) Loja was brought to the scene and identified the group members, who were then placed into custody. (Id. at 1774–76).

When petitioner was handcuffed, he informed the police that he was carrying a knife. (Id. at 1804–05.) A police officer removed a black object from petitioner's underwear waistband

and opened it to confirm that it was a folding pocket knife.  (Id. at 1806.)  The officer testified that he observed blood on the blade of the knife and that petitioner said "I stabbed him."  (Id. at 1807.)  While in custody, petitioner told the police that he had found this black knife in a hotel room and had stabbed Lucero with it.  (Id. at 2819.)

On April 19, 2010, a jury found petitioner guilty of manslaughter in the first degree as a hate crime, gang assault in the first degree, conspiracy in the fourth degree, and three counts of attempted assault in the second degree as a hate crime.  (Tr. 3969–71.)  On May 26, 2010, petitioner was sentenced to a determinate period of imprisonment of twenty-five years with a period of two and one-half years of post-release supervision on the manslaughter count, an indeterminate period of imprisonment of one and one-third to four years on the conspiracy count, and an indeterminate period of imprisonment of two and one-third to seven years on each of the remaining counts.  (Sentencing Transcript 93–95, ECF No. 10-14.)  All of Conroy's sentences were to run concurrently.  (Id.)

### B.  Procedural Background

Petitioner appealed his conviction and sentence to the Second Judicial Department of the Appellate Division, raising 11 separate arguments.  (See Pet. 2.)  On January 30, 2013, the Second Department affirmed petitioner's conviction, finding his arguments meritless.  See People v. Conroy, 102 A.D.3d 979 (App Div. 2d Dep't 2013).  Petitioner applied for leave to appeal to the New York State Court of Appeals, and his application was denied on July 16, 2013.  See People v. Conroy, 21 N.Y.3d 1014 (N.Y. 2013).  Petitioner's direct appeal became final on October 11, 2013, when his 90-day period within which to seek a writ of certiorari from the United States Supreme Court expired.  See Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001).  Conroy has not pursued post-conviction collateral relief at the state level.

### C.  The Instant Petition

On September 12, 2014, petitioner, now proceeding <u>pro se</u>, timely moved on nine separate grounds for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  All nine grounds had been raised and ruled upon in petitioner's direct appeal.  Those grounds are as follows:

> (1) That the trial court failed to respond meaningfully to a juror note requesting a read back of the cross-examination of Detective McLeer, one of the prosecution's key witnesses;

> (2) That the trial court precluded petitioner from calling two detectives to explain the circumstances surrounding the creation of Loja's pre-trial statements;

> (3) That the trial court denied defense counsel's application to redact "propensity evidence" contained in petitioner's written statement;

> (4) That the prosecution elicited testimony that had been specifically precluded by the trial court, and the trial court denied defense counsel's motion to strike that prohibited testimony;

> (5) That the trial court permitted black bunting to remain draped around defense table during a portion of the jury selection, while no similar bunting was draped around the prosecution table;

> (6) That the trial court refused to charge the jury with the lesser included offenses of criminally negligent homicide and gang assault in the second degree;

> (7) That the trial court improperly joined the two separate indictments against petitioner for trial;

> (8) That the trial court precluded the jury from considering petitioner's descriptions of certain out-of-court statements by co-defendant Christopher Overton—who did not testify—for the truth of the matter asserted; and

> (9) That the evidence presented to the jury was insufficient, as a matter of law, to convict petitioner beyond a reasonable doubt of every element of the crimes charged.

(Pet. 7-17; <u>see also</u> Affirmation and Memorandum of Law in Support of Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Pet. Mem."), ECF No. 2.)  Respondent opposed petitioner's application on November 7, 2014.  (Respondent's Memorandum of Law, ECF No. 10-2.)  The Court has fully considered all submissions of the parties.

# II.    DISCUSSION

## A. Standards of Review

Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996), to restrict "the power of federal courts to grant writs of habeas corpus to state prisoners." Williams v. Taylor, 529 U.S. 362, 399 (2000) (O'Connor, J., concurring). Under AEDPA, a district court will "entertain an application for a writ of habeas corpus [on] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). To make that showing, the petitioner must satisfy three hurdles: (1) the exhaustion of state remedies, (2) the absence of a procedural bar, and (3) the satisfaction of AEDPA's deferential review of state court decisions. See 28 U.S.C. § 2254.

### 1.  Exhaustion

A court cannot review a habeas petition unless a petitioner "has exhausted the remedies available" in state courts. 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is designed to provide state courts with the "'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" Jackson v. Edwards, 404 F.3d 612, 619 (2d Cir. 2005) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). Therefore, a petitioner must show that he fairly presented his federal claim to the "highest state court capable of reviewing" that claim. Jackson v. Conway, 763 F.3d 115, 151 (2d Cir. 2014) (quoting Rosa v. McCray, 396 F.3d 210, 217 (2d Cir. 2005); see also Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 190 n.3 (2d Cir. 1982) (en banc). Although the petitioner need not "'cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.'" Jackson, 763 F.3d at 133 (quoting Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011)).

Here, petitioner raised the arguments underlying all nine of his proffered grounds for habeas relief on direct appeal to the Second Department and requested leave to appeal that decision to the Court of Appeals. (See Pet. 2–4; see also People v. Conroy, 102 A.D.3d 979 (App Div. 2d Dep't 2013); People v. Conroy, 21 N.Y.3d 1014 (N.Y. 2013).) Petitioner has thus satisfied the exhaustion requirement with respect to all of his grounds for relief.

### 2. Procedural Default

A federal court cannot review a habeas petition "when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)). For this reason, under the doctrine of procedural default, a federal court will not review "the merits of claims, including constitutional claims, that a state court declined to hear because the petitioner failed to abide by a state procedural rule." Martinez v. Ryan, 566 U.S. 1, 9 (2012). Rather, a federal habeas court can only review a state court decision if it qualifies as an adjudication on the merits. "'Adjudicated on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Whitehead v. Haggett, No. 12-cv-04946, 2017 WL 491651, at *10 (E.D.N.Y. Feb. 6, 2017) (quoting Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001)). In order to constitute an "adjudication on the merits," however, a state court decision need not "explain[] its reasoning process." Acosta v. Artuz, 575 F.3d 177, 189 n.5 (2d Cir. 2009) (quoting Sellan, 261 F.3d at 311). Rather, "when a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court

precedent." Sellan, 261 F.3d at 311–12.  Thus, "a federal habeas court must defer in the manner

prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if

the state court does not explicitly refer to either the federal claim or to relevant federal case law."

Sellan, 261 F.3d at 312.

Here, the Second Department adjudicated all of petitioner's claims on the merits by (a)

providing an explicit rationale for its denial of petitioner's appeal based on the arguments for his

first, second, sixth, seventh, and ninth grounds and (b) finding that petitioner's "remaining

contentions"—which included the arguments for his third, fourth, fifth, and eighth grounds—

"were without merit."  See People v. Conroy, 102 A.D.3d 979 (App. Div. 2d Dep't 2013).  The

Court of Appeals denied petitioner leave to appeal from that decision.  The Second Department's

decisions thus qualify as an "adjudication on the merits" and none of petitioner's grounds are

procedurally barred.

### 3.  AEDPA Standard of Review

Where a claim is both exhausted and not subject to a procedural bar, a federal court may

review the merits of the state court decision on that issue, subject to the deferential standard set

out by AEDPA.  Under that standard, a federal court may grant a writ of habeas corpus only

where the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d).  The Supreme Court has construed AEDPA "to give independent meaning

to 'contrary [to]' and 'unreasonable.'"  Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000).

A state court's decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13 (O'Connor, J., concurring). A decision involves "an unreasonable application" of clearly established federal law when a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Id. at 413. This standard does not require that all reasonable jurists agree that the state court was wrong. Id. at 409–10. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

AEDPA "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." Jones v. Murphy, 694 F.3d 225, 234 (2d Cir. 2012) (quoting Hardy v. Cross, 565 U.S. 65, 66 (2011) (per curiam)). This standard is "difficult to meet." White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (quoting Metrish v. Lancaster, 133 S. Ct. 1781, 1786 (2013)), reh'g denied, 134 S. Ct. 2835 (2014). A petitioner must show that the "state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 1702.

A state court's determinations of factual issues are "presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006). A state court's findings of fact will be upheld "unless objectively unreasonable in light of the

evidence presented in the state court proceeding." Lynn, 443 F.3d at 246–47 (quoting Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)). Thus, a federal court may overrule a state court's judgment only if, "after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated." Williams, 529 U.S. at 389.

### 4. Pro Se Status

Petitioner "bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated." Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997). In light of petitioner's pro se status, however, the Court construes his submissions liberally and interprets them "to raise the strongest arguments that they suggest." Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir. 2014) (per curiam) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). Petitioner is not, however, excused "from compliance with relevant rules of procedural and substantive law." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006) (quoting Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983)).

## B. Petitioner's Claims for Relief

### 1. First Ground

As his first ground for relief, petitioner argues that the trial court failed to respond meaningfully to a juror note requesting a read back of the cross-examination of Detective McLeer, a prosecution witness. Petitioner argues that the trial court erred in denying his request that the court also conduct a read back of re-cross and re-re-cross. (Tr. 3953.)

As an initial matter, petitioner does not explicitly argue that the trial court's decision violated any federal right. Instead, petitioner argues that the trial court's response to the juror note violated New York Criminal Procedure Law § 310.30, which requires that, in response to a jury request for information, the court "must give such requested information or instruction as

the court deems proper." (See Pet. Mem at 14–17.) It is well established that "it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions." Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001); see also Council v. Connell, No. 08-cv-11357, 2010 WL 1140879, at *7 (S.D.N.Y. Mar. 25, 2010) (report and recommendation), adopted by, No. 08-cv-11357, 2010 WL 2884746 (S.D.N.Y. July 20, 2010) (adopting the magistrate judge's finding that a violation of CPL § 310.30 did "not implicate the Constitution, laws or treaties of the United States, [and therefore] is not amenable to federal habeas corpus review"). Even assuming that petitioner had demonstrated a violation of state law—and it does not appear that he has done so—petitioner's first ground therefore cannot form the basis for habeas relief.

Even if the Court liberally construes plaintiff's first ground as arguing that he was denied his federal due process right to a fair trial, petitioner is still not entitled to his requested relief.[3] On appeal, the Second Department found that "the trial court properly denied the defense counsel's request for a reading of additional testimony, since the court had no obligation 'to direct the reading of testimony beyond that requested.'" People v. Conroy, 102 A.D.3d at 981 (quoting People v. Murray, 258 A.D.2d 936, 936 (App Div. 4th Dep't 1999)).

A trial court's response to a juror note may constitute grounds for habeas relief only where the deficient response "so infected the entire trial that the resulting conviction violates due process." Corines v. Superintendent, Otisville Corr. Facility, 621 F. Supp. 2d 26, 38 (E.D.N.Y. 2008) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). For the reasons that follow, the trial court's response was not such that the resulting conviction violated due process.

---

[3] Petitioner's brief on direct appeal included a brief note that the trial court's response to the juror note "denied appellant his right to a fair trial," citing the Fifth and Fourteenth Amendments with no further discussion. (See Appellant's Brief 26, ECF No. 10-4.) The Court thus assumes that petitioner has exhausted the available state law remedies for this argument.

Here, the jury specifically requested a read back of the cross-examination of Detective McLeer, and the court provided such a read back. (Tr. 3951.) Petitioner's attorney requested that the court also read the witness's re-cross and re-re-cross, arguing that the jury did not "know the terminology of re-cross and re-re-cross." (Id. at 3952.) There is no indication in the record that the jury was dissatisfied or confused with the read back, and the jury did not request any additional testimony from Detective McLeer. Since the jury had previously asked for clarification on certain on the trial court's legal instructions, it appears that the jury was aware that it was authorized to make additional requests for clarification. (See id. at 3957). The fact that it made no additional requests with respect to Detective McLeer's testimony therefore indicates that it was satisfied with the trial court's initial response.

Even assuming that the trial court's response was deficient, however, petitioner was not subject to any resulting prejudice. First, the jury had already listened to that testimony in full at trial. Next, although petitioner argues that Detective McLeer's re-cross and re-re-cross revealed that petitioner had "passed on the ready opportunity to assault a Mexican national," that argument is unavailing. (Pet. Mem. 17.) Indeed, the record already contained substantial evidence that petitioner targeted Hispanics for attacks, including petitioner's own statements.

In short, the Second Department's determination that the trial court's response did not violate due process was neither contrary to nor an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts. Petitioner is therefore not entitled to habeas relief on this ground.

## 2. Second Ground

Next, plaintiff argues that he was denied his due process right to a fair trial when the trial court precluded him from calling the detectives who had taken Loja's written statement

immediately following the incident on November 8, 2008. At trial, Loja testified that the group called out certain derogatory names, including names specifically targeting Hispanic immigrants. (Tr. 2057.) In his prior written statement, however, Loja did not mention the epithets specifically targeting Hispanic immigrants. (Id.) When asked about the inconsistencies on cross, Loja responded: "From the very beginning, I told them how everything happened, what was said. If they didn't write it down, I don't know why." (Id.) Defense counsel then moved to call the detectives who had taken Loja's statements in order to explain the circumstances surrounding the creation of those pre-trial statements, but the trial court denied the motion, reasoning that the intended examination was "merely a collateral attack with respect to credibility." (Id. at 2961-2962.) Petitioner argues that this decision violated his due process right. On appeal, the Second Department found that "the admission of extrinsic evidence of these prior statements would have been cumulative" and, therefore, that the trial court "providently exercised its discretion in precluding the defendant from presenting" such extrinsic evidence. People v. Conroy, 102 A.D.3d at 980–81.

The Supreme Court has held that, "[w]ithin limits, the judge may . . . refuse to allow cumulative, repetitive, or irrelevant testimony." Geders v. United States, 425 U.S. 80, 86–7 (1976). For the reasons that follow, the Second Department's affirmation of the state court's decision to preclude the proffered testimony was neither contrary to nor an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts.

First, defense counsel was able to cross-examine Loja effectively, drawing attention to the inconsistencies between his testimony on direct examination and his prior statements. (Tr. 2044–2049.) Second, Hausch testified both that the group used epithets not mentioned by Loja

and that the group did not use certain epithets that Loja claims were used. (Id. at 2310.) Hausch's testimony thus further contradicted Loja. Third, the record contained ample testimony—including testimony both from petitioner and from Detective McLeer—that contradicted Loja's trial testimony concerning the use of epithets specifically targeting Hispanic immigrants. (See, e.g., id at 2892 (McLeer testified that, when he interviewed Loja shortly after the attack, Loja told him that the only "racial comments" used by the attackers were "niggers" and "fucking niggers," and not "fuckin' Mexicans, Spics, anything like that"); 3241 (petitioner testified that the attackers "were yelling like, 'You assholes, you niggers and you mother fuckers,' and I think Nicky Hausch said, 'beaners.'") Thus, the record was more than sufficient to impeach Loja's credibility concerning the specific racial epithets used.

Further, even if the proffered testimony would have led the jury to discredit Loja's trial testimony concerning the specific racial epithets used, there was ample evidence of petitioner's intent to attack Loja and Lucero based on his belief or perception regarding their race, color, ethnicity, or national origin. For instance, Moran testified that he heard petitioner and other members of the group discussing plans to carry out an attack on a person of Mexican descent. (Id. at 1646–48.) Likewise, petitioner's written statement indicated that "[t]here have been times in the past when I have been with other groups and we would go 'Mexican hopping,' which is looking for Spanish people to beat up." (Id. at 3379–80). And, in any event, the detectives' testimony could not have disproved petitioner's intent because Loja's written statement still indicated that petitioner used certain racial slurs, which is highly probative of race-bias.

Therefore, the Second Department's decision was neither contrary to nor an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts, and petitioner is not entitled to habeas relief on this ground.

### 3. Third Ground

Petitioner argues that he was denied his due process right to a fair trial when the trial court denied defense counsel's application to redact "propensity evidence" contained in petitioner's written statement. On appeal, the Second Department found that "evidence of uncharged crimes committed by the defendant and his codefendants, and prior statements or acts of animosity or hostility, were properly admitted under the circumstances of this case, to complete the narrative of the events, provide background material, and as evidence of motive or state of mind with respect to the crimes charged." People v. Conroy, 102 A.D.3d at 980. For the reasons set forth below, the state court's decision was neither contrary to nor an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts.

"[F]ederal habeas corpus does not lie for errors of state law. . . . In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Forino v. Lee, No. 10-cv-5980, 2016 WL 7350583, at *6 (E.D.N.Y. Dec. 19, 2016) (quoting Estelle v. McGuire, 502 U.S. 62, 68 (1991)). "Since generally, habeas relief does not lie for errors of state law, '[e]rroneous evidentiary rulings rarely rise to the level' of a due process violation." Taylor v. Connelly, 18 F. Supp. 3d 242, 258 (E.D.N.Y. 2014) (quoting Washington v. Schriver, 255 F.3d 45, 56 (2d Cir. 2001)); see also Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983) ("[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus"). In order for petitioner to prevail on a claim regarding an evidentiary error, he must demonstrate that the error deprived him of his right to "a fundamentally fair trial." Taylor v. Curry, 708 F.2d at 891; see also Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004) ("Even

erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a fundamentally fair trial.'") (quoting <u>Rosario v. Kuhlman</u>, 839 F.2d 918, 925 (2d Cir. 1988))).

In determining whether a state court's alleged evidentiary error deprived a petitioner of a fundamentally fair trial, federal courts engage in a two-part analysis. First, courts consider whether the trial court's evidentiary ruling was erroneous under state law. Second, if an error was made, courts consider whether the error amounted to a denial of the constitutional right to a fundamentally fair trial. See <u>Wade v. Mantello</u>, 333 F.3d 51, 59–60 & n.7 (2d Cir. 2003).

*i. Admissibility Under New York State Law*

Under New York law, "[a] trial court may admit into evidence uncharged crimes when the evidence is relevant to a pertinent issue in the case other than a defendant's criminal propensity to commit the crime charged." <u>People v. Till</u>, 87 N.Y.2d 835, 836 (N.Y. 1995). However, "such evidence is admissible only upon a trial court finding that its probative value for the jury outweighs the risk of undue prejudice to the defendant." <u>Id.</u> (citations omitted). In <u>People v. Molineux</u>, the New York Court of Appeals stated:

> Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial.

168 N.Y. 264, 293 (N.Y. 1901). This list is "illustrative and not exhaustive," <u>People v. Rojas</u>, 97 N.Y.2d 32, 37 (N.Y. 2001), and evidence of uncharged crimes that is necessary to provide "background material" or to "complete the narrative of the episode" may also be admissible. <u>Till</u>, 87 N.Y.2d at 837 (internal citations omitted).

The contested evidence of petitioner's prior misconduct was admissible under New York law. In relevant part, petitioner's written statement stated: "There have been times in the past when I have been with other groups and we would go 'Mexican hopping,' which is looking for Spanish people to beat up." (Tr. 2838.) This evidence was properly admitted to provide necessary background concerning both the nature of the attacks and petitioner's state of mind and intent. Specifically, petitioner's written statement helped to show that he targeted Lucero, Loja, Cordovo, Costillo, and Sierra on the basis of his perceptions or beliefs about their race, color, ethnicity, or national origin, which is a necessary element of the charged hate crimes. The probative value of this evidence thus outweighed its potential prejudicial effect and the evidence of petitioner's prior misconduct was admissible under New York law. As such, petitioner is not entitled to habeas relief on this ground and the Court need not inquire into whether he was deprived of his right to a fundamentally fair trial. See Wade, 333 F.3d at 59.

### ii. Deprivation of Fair Trial or Due Process Right

Even assuming that the trial court had erred, however, petitioner was not deprived of his right to a fair trial. "As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice." Lisenba v. California, 314 U.S. 219, 236 (1941). To amount to a violation of due process, wrongfully admitted evidence must be "so extremely unfair that its admission violates 'fundamental conceptions of justice.'" Dowling v. United States, 493 U.S. 342, 352 (1990) (quoting United States v. Lovasco, 431 U.S. 783, 790 (1977)). Further, even if a constitutional error occurred, it "will merit habeas corpus relief only if it had a 'substantial and injurious effect or influence in determining the jury's verdict.'" Sierra v. Burge, No. 06-cv-14432, 2007 WL 4218926, *6 (S.D.N.Y. Nov. 30, 2007) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).

This standard is not met here. The evidence of prior misconduct was not "so extremely unfair that its admission violates 'fundamental conceptions of justice.'" Dowling, 493 U.S. at 352. Indeed, the jury was presented with overwhelming evidence that petitioner targeted individuals based on his perception of their race, color, ethnicity, or national origin.

In any event, under the deferential AEDPA standard of review, petitioner must show that the state court's resolution of this issue was contrary to or an unreasonable application of clearly established federal law. The Supreme Court has never held that a criminal defendant's due process right is violated by the introduction of prior bad acts or uncharged crimes. See, e.g., Huddleston v. United States, 485 U.S. 681, 685 (1988) (noting that prior bad acts may be allowed to show motive, opportunity, or knowledge); see also Parker v. Woughter, No. 09-cv-3843, 2009 WL 1616000, at *2 (S.D.N.Y. June 9, 2009) ("[P]etitioner cites no Supreme Court case, and the Court is aware of none, holding that the admission of evidence of uncharged crimes violates the Due Process Clause of the Fourteenth Amendment."). This is especially true where, as here, the prior bad acts are directly relevant to an element of the charged crime.

The state court's decision was therefore neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts. Petitioner's third ground thus does not form a basis for habeas relief.

### 4. Fourth Ground

Petitioner argues that he was denied his due process right to a fair trial when the prosecutor elicited testimony that the trial court had previously precluded, and when the trial court subsequently denied defense counsel's motion to strike that prohibited testimony. (Pet. Mem 24–25.) In particular, petitioner argues that Moran's testimony that certain members of the group had discussed the fact that "someone jumped a Mexican earlier that day" was evidence of

petitioner's "guilt by association" and petitioner's propensity to commit the crimes charged in the indictments. (Id. (quoting Tr. at 1638).) The Second Department found this argument to be "without merit." People v. Conroy, 102 A.D.3d at 981. For the reasons set forth below, the Court finds that the state court's decision was neither contrary to nor an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts.

As stated above, courts considering habeas petitions based on an allegedly erroneous evidentiary ruling first consider whether the ruling was actually erroneous under state law and, if it was erroneous, then consider whether the error amounted to the denial of the constitutional right to a fundamentally fair trial. See Wade, 333 F.3d at 59-60 & n.7.

Under New York law, evidence of uncharged crimes that is necessary to provide "background material" or to "complete the narrative of the episode" may be admissible. Till, 87 N.Y.2d at 837 (internal citations omitted). Thus, Moran's testimony was properly admitted under New York law to provide the necessary background to the jury to understand the events leading up to the attack on the night of November 8, 2008, as well as the group's motive and intent. Specifically, it showed that the group had the intention of assaulting individuals of Mexican descent, which was a necessary element of the hate crimes with which petitioner had been charged. Even were the decision to admit the evidence erroneous under New York law, however, such error did not deprive petitioner of his due process right to a fair trial given the overwhelming evidence against him.

Therefore, the trial court's decision to admit Moran's testimony is not a viable ground for petitioner's requested habeas relief.

### 5. Fifth Ground

Petitioner argues that he was denied his right to a fair trial when the trial court permitted black bunting to remain draped around the defense table during a portion of the jury selection, while no similar bunting was draped around the prosecutor's table. Petitioner's argument appears to be that the presence of such bunting unnecessarily obscured his hands and feet during jury selection and may have caused jurors to assume, incorrectly, that he was shackled. The Second Department found this argument to be "without merit." People v. Conroy, 102 A.D.3d at 981.

The use of visible shackles, or the use of some obscuring technique to hide such shackles from the jury, may implicate a defendant's due process rights. See Deck v. Missouri, 544 U.S. 622, 626, 633 (2005), abrogated on other grounds, Fry v. Pliler, 551 U.S. 112 (2007). As an initial matter, visible shackling undermines the basic premise that defendants are presumed innocent until proven guilty. Id. at 630. If a defendant is shackled before a jury, it can suggest to the jury that "the justice system itself sees a need to separate a defendant from the community at large." Id. The use of shackles can also impede a defendant's right to counsel by interfering with the defendant's "ability to communicate with his lawyer." Id. at 631. Similarly, shackles may interfere with a defendant's ability to participate in his own defense by preventing him from taking the witness stand. Id. Finally, the use of shackles may constitute an "affront [to] the dignity and decorum of judicial proceedings." Id.

When table bunting is placed around the defense table and not the prosecutor's table, a jury may become aware of the potential out-of-sight use of shackles. See, e.g., People v. Cruz, 17 N.Y.3d 941, 944-45 (N.Y. 2011). A defendant's due process rights may be implicated in

situations where a jury might infer that a defendant was shackled, even if it did not see the shackles directly.  See id. at 944.

Here, however, the black bunting was present only for a portion of jury selection and was removed shortly after defense counsel objected to its presence.  (Tr. 1190.)  Thus, for almost the entire trial, the jury was able to observe for themselves that petitioner was neither shackled nor restrained.  And, because petitioner was, in fact, unshackled, there was no negative impact on his ability to communicate with his lawyer or to take the witness stand.

The brief presence of the black bunting around the defense table during a portion of jury selection therefore did not unduly prejudice petitioner.  The state court's decision to that effect was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts.  This argument thus forms no basis for habeas relief.

### 6.  Sixth Ground

At trial, the court refused defendant's request to charge the jury concerning criminally negligent homicide, a lesser included offense of manslaughter in the first degree as a hate crime. The trial court did, however, grant plaintiff's alternative request to instruct the jury with respect to manslaughter in the second degree as a lesser included offense.  The trial court also denied defendant's requested charge concerning gang assault in the second degree, a lesser included offense of gang assault in the first degree.  The jury ultimately convicted plaintiff of manslaughter in the first degree as a hate crime and gang assault in the first degree, as charged in the indictment.  Petitioner argues that the trial court's denial of his requested charges violated his due process rights.

On direct appeal, the Second Department found that the trial court's refusal to instruct the jury concerning these lesser included offenses "does not warrant reversal." People v. Conroy, 102 A.D.3d at 981. Specifically, the Second Department found that "review of the trial court's refusal to charge the remote lesser-included offense of criminally negligent homicide is foreclosed" because "the jury convicted the defendant of manslaughter in the first degree as a hate crime, as charged." Id. (citing People v. Green, 5 N.Y.3d 538, 545 (N.Y. 2005) ("[w]here a court charges the next lesser included offense of the crime alleged in the indictment, but refuses to charge lesser degrees than that . . . the defendant's conviction of the crime alleged in the indictment forecloses a challenge to the court's refusal to charge the remote lesser included offenses")).

The Second Department also found that the trial court's refusal to instruct the jury on "gang assault in the second degree as a lesser-included offense to gang assault in the first degree also does not warrant reversal" because, "by convicting the defendant of manslaughter in the first degree as a hate crime, the jury found that the defendant intended to inflict serious physical injury on the victim," a finding that precludes the applicability of the requested lesser-included offense. People v. Conroy, 102 A.D.3d at 981. The Second Department explained that, under New York law, even where a trial court's failure to give a requested charge amounts to error, such error is harmless where the jury's findings on other counts indicate that the jury would not have reached a different conclusion even had the requested charge been given. See, e.g., People v. Rodriguez, 16 N.Y.3d 341 (N.Y. 2011).

"Neither the Supreme Court nor [the Second Circuit] has decided whether the failure to instruct the jury on lesser included offenses in noncapital cases is a constitutional issue that may be considered on a habeas petition." Knapp v. Leonardo, 46 F.3d 170, 179 (2d Cir. 1995) (citing

Rice v. Hoke, 846 F.2d 160, 164–65 (2d Cir. 1988)); see also Platt v. Ercole, No. 06-cv-2072, 2010 WL 3852042, at *3 (E.D.N.Y. Sept. 27, 2010). Given the unsettled nature of federal law in this area, a claim that a trial court erred in failing to instruct the jury on a lesser-included offense in a non-capital case is not cognizable in a habeas corpus proceeding. See Bonilla v. Lee, 35 F. Supp. 3d 551, 569 (S.D.N.Y. 2014) (citing Jones v. Hoffman, 86 F.3d 46, 48 (2nd Cir. 1996)). Thus, petitioner's sixth ground cannot form a basis for habeas relief.

### 7. Seventh Ground

Petitioner argues that he was denied his right to a fair trial when the trial court joined the two indictments against him for trial. Indictment 3032A-2008 charged petitioner with the following crimes stemming from the incident on November 8, 2008: (1) murder in the second degree of Lucero as a hate crime; (2) manslaughter in the first degree of Lucero as a hate crime; (3) gang assault in the first degree of Lucero; (4) conspiracy in the fourth degree; (5) attempted assault in the second degree of Loja as a hate crime; and (6) attempted assault in the second degree of Sierra as a hate crime. (Tr. 30-36). Indictment 236A-2009 charged petitioner with attempted assault in the second degree of Cordovo as a hate crime stemming from the incident on November 3, 2008. (Id. at 36.)

Petitioner argues that the joinder was improper because there was a high likelihood that the jury would evaluate the evidence of the two incidents cumulatively, rather than separately. (Pet. Mem. 35–39.) On appeal, the Second Department found that the indictments were properly joined for trial because "inter alia, . . . proof of each offense was material and admissible as evidence in chief of the other offenses." People v. Conroy, 102 A.D.3d at 981 (citing C.P.L. 200.20(2)).

"Improper joinder of charges against a defendant does not, in itself, amount to a constitutional violation." McKinnon v. Superintendent, Great Meadow Corr. Facility, 422 F. App'x 69, 72 (2d Cir. 2011) (citing United States v. Lane, 474 U.S. 438, 446 n. 8 (1986)). Rather, joinder of offenses "rises to the level of a constitutional violation only if it 'actually render[s] petitioner's state trial fundamentally unfair and hence, violative of due process.'" Herring v. Meachum, 11 F.3d 374, 377 (2d Cir. 1993) (quoting Tribbitt v. Wainwright, 540 F.2d 840, 841 (5th Cir. 1976)). To determine whether joinder renders a trial fundamentally unfair, "it is only the consequences of joinder, over which the trial judge has much control, and not the joinder itself," that may be considered. Id. The Second Circuit has recognized that, when indictments are joined, there is a danger that a jury may consider evidence cumulatively or "regard with a more jaundiced eye a person charged with two crimes than a person charged with one." Id. The Circuit, however, has also held that a jury can be expected to follow the judge's limiting instructions and that the state has a valid interest in judicial convenience. Id. In order to succeed on a claim of improper joinder, therefore, a defendant must "prove that actual prejudice resulted from the events as they unfolded during the joint trial." Id. at 377–78.

Petitioner argues that "by joining these two indictments, the People were able to present an unflattering picture of [petitioner], portraying him as someone who associated with violent racists and bigots and therefore, was one himself." (Pet. Mem. 39.) Petitioner's argument is without merit. Because petitioner was charged with hate crimes, evidence that he attacked individuals based on his beliefs or perceptions about their race, color, ethnicity, or national origin was admissible whether the indictments were tried separately or together. As such, the jury would have learned of the facts underlying both indictments even if joinder had not been granted.

Because petitioner has not shown that the joinder prejudiced him, the state court's decision was neither contrary to nor an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts. Petitioner's seventh ground therefore does not form a basis for habeas relief.

### 8. Eighth Ground

Petitioner argues that it was error for the trial court to instruct the jury to consider the out-of-court statements of co-defendant Overton—who did not testify at trial—only as state-of-mind evidence, rather than for the truth of the matter asserted. Petitioner had testified about Overton's out-of-court statements as follows:

> [Overton] said, "Jeff, I think I just stabbed the guy in the shoulder. I really cannot get in trouble with this. Can you please take the knife. I only nicked him and I promise you he's not hurt." And then, after that, I'm like, "Why can't you get in trouble for this?" He says, "Because I already told you that I was involved in a murder case last year and I still haven't gotten sentenced and I'll be screwed if I get caught. So can you please take the knife." And then he's like, "Look back. He's even walking away." I looked back and the guy was walking away.

(Tr. 3251–52.) The trial court denied petitioner's request to instruct the jury that they could consider Overton's purported statements for the truth of the matter asserted, instead instructing the jury that they could consider those statements only as state-of-mind evidence. (Tr. 3213–14.) Petitioner argued on appeal that the trial court's decision was erroneous, but the Second Department found that petitioner's argument was "without merit." People v. Conroy, 102 A.D.3d at 981.

As noted above, a trial court's evidentiary rulings—even where erroneous—"warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a fundamentally fair trial.'" Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004) (quoting Rosario v.

<u>Kuhlman</u>, 839 F.2d 918, 925 (2d Cir. 1988)).  Under New York law, hearsay may be admissible as "a declaration against the maker's penal interest" where the following conditions are met:

> "first, the declarant must be unavailable as a witness at trial;
>
> second, when the statement was made the declarant must be aware that it was adverse to his penal interest;
>
> third, the declarant must have competent knowledge of the facts underlying the statement; and,
>
> fourth, and most important, supporting circumstances independent of the statement itself must be present to attest to its trustworthiness and reliability."

<u>People v. Settles</u>, 46 N.Y.2d 154, 166–167 (N.Y. 1978).

Here, the "fourth, and most important" element is lacking: there are <u>no</u> supporting circumstances to attest to the trustworthiness and reliability of Overton's purported statement. There was no evidence that Overton had a knife on his person on the night of November 8, 2008, or that he was the one who stabbed Lucero.  Further, no witness had seen Overton give the knife to petitioner.  Petitioner argues that Overton habitually carried a knife on his person and had previously been involved "in a home invasion/murder," concluding that Overton "was no stranger to situations that resulted in a killing."   (Pet. Mem. 42.)  This is mere speculation, however, and is insufficient to demonstrate the required trustworthiness and reliability.

The Second Department's decision that petitioner's argument was "without merit" was therefore neither contrary to nor an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts.  As such, petitioner's eighth ground does not warrant habeas relief.

### 9. Ninth Ground

As his final ground for relief, petitioner argues that his guilt has not been proven beyond a reasonable doubt and that the verdict was against the weight of the evidence. Specifically, he argues that the evidence at trial failed to establish proof of:

> (1) intent to inflict serious physical injury, as required to convict on the charges of manslaughter in the first degree as a hate crime and gang assault in the first degree;
>
> (2) the elements of attempted assault in the second degree as a hate crime as to Loja;
>
> (3) the elements of attempted assault in the second degree as a hate crime as to Cordovo; and
>
> (4) the elements of attempted assault in the second degree as a hate crime as to Sierra.[4]

On direct appeal, the Second Department found that the evidence, when viewed in "the light most favorable to the prosecution," was "legally sufficient to establish the defendant's guilt of the crimes charged beyond a reasonable doubt." People v. Conroy, 102 A.D.3d at 980. In so concluding, the Second Department "conduct[ed] an independent review of the weight of the evidence" but "accord[ed] great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor." Id.

A petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in an application for a writ of habeas corpus. Einaugler v. Supreme Court of the State of N.Y., 109 F.3d 836, 840 (2d Cir. 1997) (quoting Quirama v. Michele, 983 F.2d 12, 14 (2d Cir. 1993)). A criminal conviction in state court will not be reversed if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307,

---

[4] Petitioner has not argued that his conspiracy conviction was against the weight of the evidence.

319 (1979) (emphasis in original); see also Policano v. Herbert, 507 F.3d 111, 115–16 (2d Cir. 2007) (stating that "[i]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt") (quoting Jackson, 443 U.S. at 324)); Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial."). A criminal conviction will stand so long as "a reasonable mind 'might fairly conclude guilt beyond a reasonable doubt.'" United States v. Strauss, 999 F.2d 692, 696 (2d Cir. 1993) (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)).

It is axiomatic that "[w]here there are conflicts in the testimony, [a federal court] must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." United States v. Ware, 577 F.3d 442, 447 (2d Cir. 2009). This is because the task of assessing witness credibility rests solely with the jury, and "the jury is free to believe part and disbelieve part of any witness's testimony." Id. (citing United States v. Josephberg, 562 F.3d 478, 487 (2d Cir. 2009)). This rule applies whether the evidence being weighed is direct or circumstantial. Id.

When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999). Having considered each of the crimes of which petitioner was convicted, the Court concludes that the Second Department's decision was neither contrary to nor an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts.

Under New York law, "[a] person is guilty of manslaughter in the first degree when, with intent to cause serious physical injury to another person, he causes the death of such person or of a third person."  N.Y. Penal Law § 125.20(1).  "A person is guilty of gang assault in the first degree when, with intent to cause serious physical injury to another person and when aided by two or more other persons actually present, he causes serious physical injury to such person or to a third person."  Id. § 120.07.  Both crimes require proof of an intent to cause "serious physical injury," which "means physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."  Id. § 10.00(10).

Petitioner claims that the evidence at trial failed to establish intent to inflict serious physical injury.[5]  Petitioner relies on the inconsistencies between his testimony, Loja's testimony, and Hausch's testimony regarding the November 8 attack as showing he had not intended to cause serious physical injury.  (Pet. Mem. 46–49.)  First, petitioner states that there was no physical evidence to corroborate Loja's testimony that he and Lucero had been the subject of sustained attacks intended to cause serious physical harm.  Petitioner points to the relative lack of evidence that either Loja or Lucero had sustained any injuries beyond the fatal stab wound and a number of minor abrasions.  (See id. at 46–47 (citing Tr. 2757–61).)  Petitioner also relies on Hausch's testimony that Shea punched Lucero only once in the face before the group, including petitioner, began to walk away.  (Id. at 47.)  Second, petitioner argues that, since the group withdrew from Lucero "immediately after the stabbing" when Lucero "was, by all appearance,

---

[5] Petitioner has argued only that the evidence was insufficient to prove the intent element of these charges; he has not addressed, and the Court therefore does not consider, whether the evidence was sufficient to prove the remaining elements of each charge.

largely unaffected by the stab wound," the evidence indicated that "the stabbing was a means to end an altercation without regard to any intent to inflict serious physical injury." (Id. at 48.)

Although there was conflicting testimony regarding the details of the attack, it is the province of the jury to determine issues of witness credibility. Ware, 577 F.3d at 447. Indeed, there was more than sufficient evidence that would allow a rational trier of fact to find that petitioner intended to cause serious physical injury to Lucero, including petitioner's written statement that he intentionally stabbed Lucero with a knife. (Tr. 2826; 2834–39.) In relevant part, that statement read:

> The Spanish guy continued to swing his belt and when we didn't back down he swung the belt at Nicky and I went toward him with my knife in my right hand extended outward. His back was to me and as I ran toward him he turned to face me. He was about four or five feet from me. I continued to run toward him and stabbed him once in either his shoulder or chest. The physical altercation ended when I stabbed the guy.

(Id. at 2837.) From this statement, a rational trier of fact could infer that petitioner intended to cause serious physical injury when he stabbed Lucero in his shoulder or chest. See, e.g., People v. Dasney, 126 A.D.3d 521, 521 (App. Div. 1st Dep't 2015) (finding that trial evidence was sufficient to establish intent to cause serious physical injury where defendant stabbed victim in the chest), leave to appeal denied, 25 N.Y.3d 1071 (N.Y. 2015); People v. Natal, 100 A.D.3d 509 (App. Div. 1st Dep't 2012) (same).

The Second Department's determination that the evidence was sufficient to convict petitioner was thus neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the entire record.

### ii. Attempted Assault in the Second Degree as a Hate Crime

Under New York law, "[a] person is guilty of assault in the second degree when with intent to cause serious physical injury to another person, he causes such injury to such person or

to a third person."  N.Y. Penal Law § 120.05.  In order for a defendant's commission of an

offense to constitute a "hate crime," the defendant must either have

> intentionally select[ed] the person against whom the offense is
> committed or intended to be committed in whole or in substantial
> part because of a belief or perception regarding the race, color,
> national origin, ancestry, gender, religion, religious practice, age,
> disability or sexual orientation of a person, regardless of whether
> the belief or perception is correct, or intentionally commit[ed] the
> act or acts constituting the offense in whole or in substantial part
> because of a belief or perception regarding the race, color, national
> origin, ancestry, gender, religion, religious practice, age,
> disability or sexual orientation of a person, regardless of whether
> the belief or perception is correct.

Id. § 485.05.  "A person is guilty of an attempt to commit a crime when, with intent to commit a

crime, he engages in conduct which tends to effect the commission of such crime."  Id. § 110.00.

Petitioner was convicted of three counts of attempted assault in the second degree as a

hate crime: one in connection with the attack on Loja, one in connection with the attack on

Cordovo, and one in connection with the attack on Sierra.  For the reasons that follow, the state

court's determination that the evidence at trial was sufficient to support each conviction was

neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it

an unreasonable determination of the facts in light of the entire record.

### a.  The Attack on Loja

Petitioner claims that the evidence at trial failed to establish the requisite proof of intent

to inflict serious physical injury for the charge of attempted assault in the second degree as a hate

crime as to Loja.  He relies on his own written statement to show Shea punched Loja once in the

face, causing only a bloody nose.  (Pet. Mem. 49.)  He also relies on Hausch's testimony to argue

that he did not intend to inflict serious injury because the group immediately withdrew after Shea

punched Loja.  (Id. at 49–50.)

There was more than sufficient evidence for a rational trier of fact to find petitioner guilty of attempted assault in the second degree as a hate crime as to Loja. Throughout trial, the testimony of numerous witnesses confirmed that the men who attacked Loja and Lucero on November 8, 2008, had the intent to inflict serious injury to any Hispanic men they might find that night. (See, e.g., id. at 1584–87, 1646–49, 2298, 2470–73, 2544, 2838, 3231–35.)

The ambiguities concerning whether Loja ever actually suffered a serious physical injury are beside the point—the evidence was sufficient for a rational jury to find that petitioner intended to cause serious physical injury to Loja, engaged in conduct which tended to cause such serious physical injury, and targeted Loja because of a belief or perception concerning his race, color, ethnicity, or national origin. The state court's determination that the evidence was sufficient to convict petitioner was therefore neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts.

### b. The Attack on Cordovo

Petitioner next claims that the evidence at trial failed to establish that he was present for the assault on Cordovo on November 3, 2008.[6] He specifically relies on his own "ambiguous" written statement and Cordovo's testimony in an attempt to show that his presence during this incident was not proven beyond a reasonable doubt. (Pet. Mem. 50.)

Contrary to petitioner's position, there was more than sufficient evidence for a rational trier of fact to find that petitioner participated in the attack on Cordovo. Specifically, Vincent Martino testified that he had stopped two young men after pursuing them from the scene of the attack on Cordovo. (Tr. 2574.) The officer who identified the two young men testified at trial that petitioner was one of the men. (Id. at 2512-2515.) Additionally, in his written statement,

---

[6] With respect to the attack on Cordovo, petitioner does argue that, even if he were present, there is insufficient evidence to prove that he had the intent to cause serious physical injury. That argument is therefore not before the Court.

petitioner stated that, "[a]bout a week ago, I was with Kuvan, Anthony, and Jose and we snuffed a Mexican on Jamaica near my house.  We knocked him out cold."  (Id. at 2838.)

Although the officer also testified that four young women had stated that petitioner was not the one who attacked Cordovo, (id. at 2516), and Cordovo himself never made an in-court identification of petitioner, a rational trier of fact could have afforded more weight to the testimony affirmatively identifying petitioner as one of the attackers.  The jury could also infer that petitioner's written admission that he had knocked a "Mexican . . . out cold" referred to the attack against Cordovo, which occurred about a week prior to the Lucero incident.

The record is thus sufficient for a reasonable jury to find that petitioner intended to cause serious physical injury to Cordovo, engaged in conduct which tended to cause such serious physical injury, and targeted Cordovo because of a belief or perception concerning his race, color, ethnicity, or national origin.  The state court's determination that the evidence was sufficient to convict petitioner was therefore neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the entire record.

### c.  The Attack on Sierra

Petitioner argues that the evidence at trial failed to show that he was one of Sierra's attackers and, therefore, that the evidence was insufficient to support his conviction in connection with that incident.  Petitioner also argues that the evidence was insufficient to establish the requisite proof of intent to inflict serious physical injury.  Petitioner relies on Sierra's vague testimony and his failure to provide an in-court identification of petitioner as one of the assailants.  (Pet. Mem. 52.)

There was, however, more than sufficient evidence for a rational trier of fact to find

petitioner guilty of attempted assault in the second degree as a hate crime as to Sierra. Hausch testified that petitioner was one of the assailants who attempted to attack Sierra, and Sierra testified that "maybe the tallest ones" had chased him, which would include petitioner. (Tr. 1931, 2304–05.) Although petitioner testified that he did not chase Sierra (id. at 3304), a rational trier of fact could have discredited that self-serving testimony.

With respect to the intent to cause serious physical injury, the evidence at trial indicated that the attack occurred after the group had specifically planned to attack individuals of Mexican descent. (See, e.g., id. at 3399–400.) When coupled with evidence that petitioner and other members of the group had previously targeted individuals for violent attacks on the basis of their race, color, ethnicity, or national origin, a rational jury could find that petitioner possessed the requisite intent with respect to the attack on Sierra.

The state court's determination that the evidence was sufficient to convict petitioner was therefore neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the entire record.

### III.    CONCLUSION

For the foregoing reasons, petitioner has demonstrated no basis for relief under 28 U.S.C. § 2254.  Accordingly, the instant petition is denied.  Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue.  See 28 U.S.C. § 2253(c)(2).  The Court further certifies pursuant to 28 U.S.C. §1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore in forma pauperis status is denied for the purpose of any appeal.  See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

The Clerk of the Court shall enter judgment accordingly and close this case.

**SO ORDERED.**

Date: July 6, 2017
Central Islip, New York

_____/s/ (JMA)_____
Joan M. Azrack
United States District Judge